IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **CHRISTOPHER ROBIN GENSLER**, | Case No. 2:18-cv-01077-IM |
| Petitioner, | **OPINION AND ORDER** |
| v. | |
| **BRAD CAIN,** Superintendent, Snake River Correctional Institution, | |
| Respondent. | |

**IMMERGUT, District Judge.**

     Petitioner Christopher Robin Gensler ("Petitioner"), an individual in custody at the Snake River Correctional Institution, brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254, alleging the ineffectiveness of trial counsel. Because the state court decision denying relief on his claim is entitled to deference, Petitioner's Amended Petition for Writ of Habeas Corpus (ECF No. 12) is DENIED, and this proceeding is DISMISSED, with prejudice.

///

PAGE 1 – OPINION AND ORDER

## BACKGROUND

On May 31, 2011, a Washington County grand jury returned an indictment charging Petitioner with four counts of Sodomy in the First Degree and ten counts of Sexual Abuse in the First Degree. (Rept's Exs. (ECF No. 34), Ex. 102 at 2–5.) The charges arose from Petitioner's alleged abuse of JG, a minor member of his family, on several occasions between September 23, 1998 and September 23, 2004.

On July 29, 2011, the grand jury returned a separate indictment charging Petitioner with one count of Sodomy in the First Degree. (*Id.* at 1.) The single charge arose from Petitioner's alleged abuse of CR, another minor member of his family, at some point between December 1, 1998 and December 31, 1999. Based on the dates alleged in the indictments, Petitioner was between twelve and eighteen years of age at the time of the alleged misconduct, and JG and CR both were younger than Petitioner. (Resp't Ex.119 at 25.)

Before trial, the State moved to consolidate the two cases pursuant to Section 132.560(1)(b)(A) of the Oregon Revised Statutes ("ORS")[1]. (Resp't Ex. 109 at 4–5.) After a hearing, the trial court determined that consolidation was appropriate because both cases arose out of the "same time frame, [the] same nature of offenses, [and] alleged victims [that are] similarly situated." (*Id.* at 5–6.) Over defense objection, the trial court granted the motion.

---

[1] ORS 132.560(1)(b)(A) provides that "two or more offenses may be charged in the same charging instrument in a separate count for each offense if the offenses charged are alleged to have been committed by the same person or persons and are . . . . [o]f the same or similar character[.]" The trial court may order two or more charging instruments consolidated if they "are found in circumstances described in subsection (1)(b)[.]" ORS 132.560(2).

PAGE 2 – OPINION AND ORDER

Petitioner thereafter moved to sever the cases for separate trials pursuant to ORS 132.560(3)[2]. (Resp't Ex. 117 at 58–64.) The trial court held a hearing on the motion, during which Petitioner primarily argued that a joint trial would substantially prejudice him because he intended to testify about the charges involving JG, but not about the charges involving CR. (Resp't Ex. 110 at 42.) With respect to the charge involving CR, Petitioner asserted that he planned to advance an incapacity due to immaturity defense[3], and that because "his defense to that [charge] involves admitting to the conduct [against CR,]" it would be "highly prejudicial for evidence regarding [that] offense to be admitted in a trial of the [offenses involving JG]." (*Id.*) Petitioner also argued that a joint trial would violate his right to due process because the jury would be inclined to use the evidence to draw the improper inference that Petitioner had a propensity to sexually abuse young children. (*Id.* at 50.)

The trial court ultimately denied the motion to sever, finding that Petitioner had failed to demonstrate that he was substantially prejudiced by consolidation because the two cases were "separate enough that the jury could make a determination very easily on one case, and on the other case, and not be confused by the conduct." (*Id.* at 70–71.) The trial court also suggested limitations on cross-examination that would allow Petitioner to testify as to the offenses involving JG, but not those involving CR, and noted that Petitioner could request an instruction to inform

---

[2] ORS 132.560(3) instructs that "[i]f it appears, upon motion, that the state or defendant is substantially prejudiced by a joinder of offenses under subsection (1) or (2) of this section, the court may order an election or separate trials of counts or provide whatever other relief justice requires."

[3] Incapacity due to immaturity is an affirmative defense pursuant to ORS 161.290, which instructs that "[a] person who is tried as an adult in a court of criminal jurisdiction is not criminally responsible for any conduct which occurred when the person was under [twelve] years of age."

PAGE 3 – OPINION AND ORDER

the jury's consideration of the evidence presented. (*Id.* at 67–69.) Notably, the trial court opined that even if the cases were severed, the evidence of each case would be cross-admissible in the other to show intent, opportunity, and motive. (*Id.* at 70.)

The cases then proceeded to trial, where the State first presented evidence as to the fourteen charges involving JG. (Tr.[4] 145–335.) Specifically, the State presented evidence that Petitioner lived with his father, stepmother, sister, and three half-brothers until 1998, when he moved to Colorado to live with his mother soon before his twelfth birthday. (Tr. 151, 254.) At that time, JG, Petitioner's half-brother, was four years old. (Tr. 208.)

Petitioner thereafter returned to Oregon regularly to visit his father and family, typically for four to six weeks in the summer and one week at Christmas. (Tr. 152, 210, 254.) During these visits, Petitioner and his siblings often built forts out of chairs and blankets in the family playroom. At one point, when alone with JG in the fort, Petitioner pulled down his pants and instructed JG to touch his penis. (Tr. 211–12.) Petitioner then moved JG's hand up and down on his penis, and further instructed JG to suck his penis. (Tr. 213.) JG complied. (Tr. 213.) Petitioner also fondled JG's penis. (Tr. 214–15.) Over time, several more incidents occurred in the playroom, in a bedroom, and in a hot tub, and each generally involved the same conduct. (Tr. 217–18, 220–23.) JG did not disclose the abuse until several months after discovering that Petitioner had moved back to Oregon in 2010, which caused JG to suffer anxiety, trouble sleeping, and weight loss. (Tr. 226–28.)

The State then presented evidence with respect to the single charge involving CR. (Tr. 336–385.) Specifically, the State presented evidence that CR, Petitioner's cousin, often went on trips

---

[4] The guilt phase trial transcript is filed as Respondent's Exhibits 111–114 (ECF No. 34).

PAGE 4 – OPINION AND ORDER

with Petitioner's family, including a trip to the beach in the spring or summer of 1998 or 1999, between CR's fourth and fifth grade year. (Tr. 338, 369–70.) During this trip, CR shared a bedroom with Petitioner, who instructed CR to touch his penis one night after everyone went to sleep. (Tr. 339.) CR did as he was told. (Tr. 339.)

The following Christmas, Petitioner spent the night with CR's family and again instructed CR to touch his penis. (Tr. 343–44.) During this incident, Petitioner also instructed CR to put his penis in his mouth, and CR obeyed. (Tr. 344.) Petitioner then touched CR's penis and put CR's penis in his mouth. (Tr. 344–45.) CR did not disclose the abuse until December 2010, when he became upset that members of the family were "bending over backwards" to help Petitioner after he returned to Oregon. (Tr. 348–50, 379.)

Petitioner testified in his own defense, but contrary to his representation at the severance hearing, he testified about both cases. (Tr. 394, 401.) Petitioner testified that his stepmother was abusive, and that prior to moving back to Oregon from Colorado in 2010, he visited Oregon only three times: once for one week in the winter of 1998; once for one month in the summer of 1999; and once for his father's birthday in 2004. (Tr. 404, 414–15.) Petitioner confirmed that he built forts with his siblings, but denied ever engaging in sexual activity while inside, and denied being alone with JG long enough for all of the incidents described to have occurred. (Tr. 421.) He further denied ever being alone with JG in a bedroom, and testified that JG was only five years old and not allowed in the hot tub during his visit in 1999. (Tr. 422.)

With respect to CR, Petitioner testified that "[CR] you know, asked me to kiss his penis, and . . . he said he would do the same to me, so he did, and then I kissed his penis, and then we pulled our pants up." (Tr. at 420.) Petitioner stated, however, that this incident occurred in 1993 when he was six years old, and that it was not intended to be a sex act. (Tr. 419.)

PAGE 5 – OPINION AND ORDER

The jury found Petitioner guilty on all counts.[5] (Tr. 557.) After polling the jury, the trial court accepted the verdicts and entered judgments of conviction. (Tr. 558–60.) In a separate proceeding, the trial court sentenced Petitioner to a custodial term totaling 175 months, with post-prison supervision to follow. (Tr. 589–90, 595–98.)

Petitioner filed a direct appeal, alleging, among other things, that "the trial court erred by denying defendant's motion to sever the CR trial from the JG trial." (Resp't Ex. 117 at 2.) Petitioner also raised several claims regarding jury unanimity. (*Id.* at 4.) In a written opinion, the Oregon Court of Appeals rejected Petitioner's claims and affirmed his convictions. (Resp't Exs. 119, 121.)

Petitioner then sought post-conviction relief based on the ineffectiveness of trial counsel. (Resp't Exs. 122, 123.) After an evidentiary hearing, the post-conviction court denied relief. (Resp't Exs. 130, 131.) Petitioner appealed, presenting a single assignment of error, as follows:

> ASSIGNMENT OF ERROR: The post-conviction court erred when it denied petitioner relief on the claim that trial counsel was ineffective and inadequate for failure to request a limiting instruction.

(Resp't Ex. 132 at 2.) The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. (Resp't Exs. 135, 136.)

On June 20, 2018, Petitioner filed a Petition for Writ of Habeas Corpus in this Court. Appointed counsel filed an Amended Petition for Habeas Corpus on October 1, 2018, presenting three grounds for relief for the Court's review:

> **Ground I:** The state trial court violated the petitioner Fourteenth Amendment due process right to a fair trial by conducting a joint trial on the two separately indicted cases.

---

[5] Three counts returned nonunanimous verdicts. (Tr. 557.) All remaining verdicts were unanimous. (*Id.*)

PAGE 6 – OPINION AND ORDER

## DISCUSSION

I.     Ground III (A)

    A.     **Legal Standards**

        1.     **Deference to State-Court Decisions Under AEDPA**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") prohibits relitigation of any claim adjudicated on the merits in state court unless such adjudication resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). A federal habeas court must apply a presumption of correctness to the state court's findings of fact, and the habeas petitioner bears the burden of rebutting that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). In other words, AEPDA imposes "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands the state-court decision be given the benefits of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotations and citations omitted).

A state-court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law occurs if the state court correctly identifies the governing legal principle but misapplies that principle to the facts of the case. *Id.* at 407. The "unreasonable application" clause requires the state court's decision to be

more than merely erroneous or incorrect. *Id.* at 410. Rather, the state court's application of clearly established federal law must be objectively unreasonable. *Id.* at 409.

A federal habeas court may not disturb a state-court decision on factual grounds unless the state court's decision was based on an unreasonable determination of the facts in light of the evidence before it. 28 U.S.C. § 2254(d)(2). Under the "unreasonable determination" clause, "[t]he question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The Ninth Circuit has clarified that when a petitioner challenges the substance of a state court's findings, the federal habeas court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.), *cert denied*, 543 U.S. 1038 (2004).

"Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Where a state court decision is issued without explanation, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id.* Where, however, the highest state court issues a decision on the merits unaccompanied by its reasons for the decision, a federal habeas court must "look through" to the last reasoned decision issued in a lower state court, and presume the unexplained decision adopted the same reasoning. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

///

///

PAGE 9 – OPINION AND ORDER

### 2. Ineffective Assistance of Counsel

An ineffective assistance of counsel claim is analyzed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 686. Such a showing requires the petitioner to overcome a strong presumption the challenged conduct falls within the "wide range of reasonable professional assistance; that is the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689. The first prong thus is satisfied only if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.

Second, a petitioner must demonstrate prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* Therefore, it is not enough if counsel's errors had only "some conceivable effect on the outcome of the proceeding." *Id.* at 693. Counsel's errors must have been "so serious as to deprive [the petitioner] of a fair trial, a trial whose result is reliable." *Id.* In making the prejudice determination, the court must "consider the totality of the evidence before the judge or jury." *Id.* at 695.

Analyzing an ineffective assistance of counsel claim under AEDPA is "all the more difficult" because both standards are "highly deferential and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). The question under such circumstances "is not whether counsel's actions were reasonable." Rather, the court must determine "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

B.     Analysis

As noted, Petitioner alleges that trial counsel was ineffective when he failed to request a jury instruction to limit the jury's "use of evidence involving one alleged victim as proof of crimes committed against the other alleged victim." (Am. Pet. at 3.)

In his post-conviction proceeding, Petitioner alleged that trial counsel provided ineffective assistance by failing to request an instruction limiting the jury's consideration of evidence relating to the prior sexual incident involving CR. (Resp't Ex. 123 at 4–6.) Petitioner argued that an instruction was necessary to "negate the 'great and obvious' danger" that the jury would impermissibly infer "a propensity that Petitioner would have committed the crimes he was charged with," and that had trial counsel requested such instruction, "the result [at trial] would have been different." (Resp't Ex. 124 at 7–8.)

In opposition, the State submitted the affidavit of trial counsel, who explained his decision not to request a limiting instruction, as follows:

> One element of our defense was to admit that petitioner had engaged in sexual activity with [CR], but that the sexual activity occurred before petitioner was [twelve] years old. Another element of our defense was to try to convince the jury that [JG]'s mother, part of petitioner's family, was against petitioner. We wanted the jury to believe that [JG]'s mother manipulated [him] to falsely accuse petitioner. I feel there was support in the evidence for this approach.
>
> The whole Gensler family was against petitioner because they were aware of the sexual activity between petitioner and [CR] when they were children, as well as his conviction for child pornography in Colorado. Therefore, when petitioner got out of prison in Colorado and returned home, our theory was that [JG]'s mother decided to get rid of him by manipulating [JG] into falsely accusing petitioner.
>
> It was important to try to make clear to the jury that petitioner had engaged in sexual activity with [CR] when petitioner was *younger* than [twelve] years old. Therefore, I had to get petitioner's version of the timeline in front of the jury.
>
> That necessarily meant having petitioner testify about that sexual contact. I considered whether or not to request a jury instruction instructing the jury that they could not use that evidence to then infer that petitioner must also have engaged in sexual contact with [JG].

PAGE 11 – OPINION AND ORDER

> I went back and forth on whether to request such an instruction. Part of my thought process involved being concerned that if I harped on this and requested a special instruction on how the evidence could be used, that might cue the deputy district attorney to have some kind of *State v. Johns* instruction regarding prior bad acts that would affirmatively affect how the jury was allowed to view the evidence of petitioner's admission he had engaged in sexual contact with [CR]. I was not certain this would occur, but thought it possible. The deputy district attorney did not seem to recognize that this was a possibility, and I did not want to get him thinking about it by trying to impose limitations on how the evidence could be used. I had opened the door, to some degree, to consideration of the evidence, and I did not want to encourage any bad effects from that.
>
> Therefore, I did not craft and request a special instruction related to how the jury could consider the evidence of petitioner's sexual activity with [CR] in deliberations on the charges involving [JG]. This decision was made after much thought, and was part of a strategy to avoid potential harmful jury instructions.

(Resp't Ex. 129 at 1–3.)

After a brief evidentiary hearing, the post-conviction court issued a written judgment denying relief. (Resp't Ex. 131.) The post-conviction court explained that Petitioner had failed to establish the merits of his claim:

> Petitioner failed to prove that his attorney was ineffective for failing to request a limiting instruction to prevent the jury from using the evidence regarding the Petitioner's sexual contact with CR before Petitioner was [twelve] years old to convict him of the alleged sex crimes related to the other victim, JG. His trial attorney considered asking for such an instruction but decided against doing so because he did not want to tip off the district attorney that he could argue the prior act was admissible as prior bad acts that could be considered in the other charges. This was not an unreasonable strategy.
>
> In addition, petitioner failed to prove there was any prejudice to him from the lack of such an instruction. The state never contended at trial that the evidence of the sexual conduct with CR had any bearing on the charges related to JG. The charges were separate and distinct and arose from [a] different time period and place. There is no evidence that the jury improperly used the evidence of his sexual conduct with CR to convict him of the charges related to JG.

(Resp't Ex. 131 at 1–2.)

Petitioner argues here, as he did on post-conviction appeal, that trial counsel's decision not to request a limiting instruction was unreasonable, because even if the prosecutor "'sought to

PAGE 12 – OPINION AND ORDER

instruct the jury as to the permissible purposes for which the evidence could be used, . . . it would still be consistent with the limiting instruction trial counsel should have requested — that the jury cannot use evidence of crimes against CR to find crimes against JG.'" (Pet'r's Br. (ECF No. 39), at 28–29.) Petitioner asserts that absent such an instruction, the jury "could have used the evidence for the impermissible purpose of 'propensity evidence,'" and thus the post-conviction court's denial of relief, "as silently affirmed by the Oregon Court of Appeals, is an unreasonable application of *Strickland* and its progeny." (*Id.* at 29.)

As the post-conviction court pointed out, however, trial counsel made a strategic decision to forego requesting a limiting instruction based on his concern that doing so might result in adverse consequences — *i.e.*, a counter-request from the State for instructions affirmatively permitting the jury to consider the evidence at issue for a non-character purpose. Such a decision, when based on a thorough investigation of the law and facts as to potential options in a given case, is "virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. Moreover, trial counsel's decision to avoid triggering the State's request for an adverse instruction is not unreasonable, particularly in light of the trial court's statement during the pretrial severance hearing that evidence from one case likely would be cross-admissible in the other to prove intent, opportunity, and motive. In addition, the Court's review of the record uncovered nothing to suggest that the jury considered the evidence in these cases for an improper purpose as Petitioner claims.

Petitioner's renewed arguments therefore do not call into question the reasonableness of the post-conviction court's determination that trial counsel was not ineffective, and that Petitioner was not prejudiced by trial counsel's failure to request a limiting instruction. Trial counsel reasonably chose, after due consideration, not to request a limiting instruction in order to avoid the State's potential counter-request for an instruction that likely would have been damaging to

PAGE 13 – OPINION AND ORDER

Petitioner. Petitioner thus has not shown that the post-conviction court's denial was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement[,]" *Richter*, 562 U.S. at 103, and the post-conviction court's decision is entitled to deference. Accordingly, the Court denies habeas relief on Ground III (A).

## II.     Unargued Claims

Petitioner does not argue the merits of the claims alleged in Grounds I or III (B) of the Amended Petition. In addition, Petitioner does not challenge Respondent's argument that those grounds are procedurally defaulted, nor has Petitioner demonstrated cause and prejudice to excuse the procedural default, or that a fundamental miscarriage of justice would occur if the Court declined to address his unargued claims. Accordingly, habeas relief is precluded as to Grounds I and III (B) because they are procedurally defaulted, and because Petitioner has failed to sustain his burden of demonstrating entitlement to habeas relief on those claims. *See* 28 U.S.C. § 2248 (instructing that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true"); *see also Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (recognizing that a habeas petitioner carries the burden of proving his case).

///
///
///
///
///

## CONCLUSION

Based on the foregoing, the Amended Petition for Writ of Habeas Corpus (ECF No. 12) is DENIED, and this proceeding is DISMISSED, with prejudice. Petitioner has not made a substantial showing of the denial of a constitutional right, and therefore this Court DENIES a Certificate of Appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

DATED this __18th__ day of August, 2021.

*Karin J. Immergut*
Karin J. Immergut
United States District Judge